**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES AMOAH TURKSON,

$\qquad$ *Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney
General,

$\qquad$ *Respondent.*

No. 10-1984

On Petition for Review of an
Order of the Board of Immigration Appeals.

Argued: September 20, 2011

Decided: January 26, 2012

Before AGEE and DIAZ, Circuit Judges, and
John A. GIBNEY, Jr., United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Petition for review granted; vacated and remanded by pub-
lished opinion. Judge Gibney wrote the opinion, in which
Judge Agee and Judge Diaz joined.

---

## COUNSEL

**ARGUED:** Timothy William Loose, GIBSON, DUNN &
CRUTCHER, LLP, Los Angeles, California, for Petitioner.
Charles S. Greene, III, UNITED STATES DEPARTMENT

OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Marshall R. King, GIBSON, DUNN & CRUT-CHER, LLP, New York, New York, for Petitioner. Tony West, Assistant Attorney General, Civil Division, Ethan B. Kanter, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

## OPINION

GIBNEY, District Judge:

This immigration case presents an issue regarding the standard of review to be applied by an administrative appellate panel. Facing deportation, petitioner James Amoah Turkson ("Turkson") asked an immigration judge ("IJ") to defer his removal because Turkson believed he would be tortured if returned to his native Ghana. The IJ ruled that Turkson would likely face torture in Ghana, and therefore deferred Turkson's removal. The Department of Homeland Security ("DHS") appealed the IJ's ruling to the Board of Immigration Appeals ("BIA").

On appeal, the BIA reviewed all aspects of the IJ's decision de novo and reversed the IJ's decision. The BIA erred in reviewing the IJ's factual findings under the de novo standard of review instead of under the clearly erroneous standard prescribed by its governing regulations. We therefore grant Turkson's petition for review, vacate the BIA's decision, and remand for further proceedings consistent with this opinion.

### I. Material Facts and Procedural History

Turkson was born in Ghana. He was subjected to violence in his native country while distributing pamphlets for the political party of which his father was a leader. To escape the

violence, he came to the United States on a false passport in 1995. He later married a United States citizen, and became a permanent legal resident.

Turkson committed a number of crimes in the United States. Most recently, Turkson was convicted of possession of marijuana with intent to distribute. Because of that conviction, DHS initiated proceedings to remove him from the United States. DHS can remove aliens who become aggravated felons under 8 U.S.C. § 1227(a)(2)(A)(iii), or who have a controlled substance conviction under 8 U.S.C. § 1227(a)(2)(B)(i). The parties agree that these provisions justify Turkson's removal.

An alien subject to removal, however, can contest his removal if he can show that he will likely face torture in his native country. Turkson applied for asylum, withholding of removal, and deferral of removal[1] under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). The IJ found him ineligible for asylum and withholding of removal based on his criminal record,[2] but granted deferral of removal under the CAT.

The IJ made detailed factual findings. He found the testimony of Turkson and his brother, regarding brutality in Ghana, to be credible. Specifically, the IJ accepted Turkson's

---

[1]An important difference between withholding of removal and deferral of removal is the ease in which the deferral may be terminated. To terminate withholding of removal, the government must move to reopen the case, meet the standards for reopening, and establish by a preponderance of the evidence that the alien is no longer eligible for withholding. In contrast, the regulations provide a streamlined termination process for deferral of removal. *See* 64 Fed. Reg. 8478-01; *see also* 8 C.F.R. § 1208.17(d),(e),(f).

[2]*See* 8 U.S.C. § 1158(b)(2)(ii) (asylum); 8 C.F.R. § 1208.16(d)(2) (withholding of removal under CAT). Turkson does not challenge the IJ's finding of ineligibility.

evidence that, in 1995, government officials had brutally questioned Turkson about his "political activities." As part of their interrogation, they forced him to walk on his knees and punched him until he lost consciousness. Turkson suffered a broken wrist, lacerations requiring stitches, a six inch scar on his back, and a knife wound.

The IJ also found that political violence continues to this day in Ghana. The political landscape, he determined, is characterized by "vigilante" violence. Prison conditions are harsh. Rural areas remain "violent" and "brutal." While cities are less violent, the IJ found that this fact would not make it any less likely that Turkson would be tortured. Throughout Ghana, police remain involved in political activity, and continue to use excessive force, characterized by the IJ as "police brutality."

Based on these determinations, the IJ found that Turkson had been the victim of torture before he left Ghana in 1995. The IJ also found that "it is more likely than not that he would be detained by the police if returned to Ghana." Further, the IJ also decided that it is more likely than not that Turkson would be tortured "because of the excessive use of force by police officers in Ghana." Based on these findings, the IJ ordered the deferral of Turkson's removal.

DHS appealed to the BIA, which considered de novo whether it was more likely than not that Turkson would be tortured upon return to Ghana. The BIA panel largely disregarded the testimony of Turkson and his brother and concluded that Turkson would not likely be tortured if returned. The BIA therefore vacated the IJ's ruling, and on October 25, 2010, Turkson was removed to Ghana. Turkson now petitions this Court for review of the BIA's rulings.

## II.   The Convention Against Torture and Its Implementation

The United States is a party to the CAT. Under Article 3 of the Convention, parties agree not to deport "a person to

another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, art. 3, 23 I.L.M. 1027, 1028.

"Torture" is a term of art under the CAT, with a specific legal definition. The CAT defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession[,] punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

*Id.* at 1027.[3]

Before removal, aliens are entitled to a hearing before an IJ. *See generally* 8 C.F.R. §§ 1208.16-1208.18. In that removal proceeding, the alien may apply for relief under the CAT. 8 U.S.C. § 1229a. To warrant CAT protection, an alien

---

[3]The CAT is not self-executing. *See Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007). Congress therefore enacted the Foreign Affairs and Restructuring Act ("FARR"), Pub. L. No. 105-277, Div. G, 112 Stat. 2681-82 (Oct. 21, 1998), to implement it. *See id.* at 666-67; *see also Pierre v. Attorney General,* 528 F.3d 180, 185-86 (3d Cir. 2008) (en banc). Thus, Turkson's claim is technically a claim under FARR, but for purposes of this opinion, we shall refer to it as a CAT claim. This practice is in accordance with other circuits. *See, e.g.*, *Pierre*, 528 F.3d at 186 n.5 (citation omitted).

must prove, first, that it is more likely than not that he will be tortured if removed to the proposed country of removal and, second, that this torture will occur at the hands of government or with the consent or acquiescence of government. 8 C.F.R. § 1208.16(c)(2).

While the burden of proof lies with the alien to establish his right to relief under the CAT, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2). The regulations direct the trier of fact to consider "all evidence relevant to the possibility of future torture." *Id.* § 1208.16(c)(3). If the IJ determines that the petitioner is more likely than not to be tortured upon removal, the petitioner is entitled to protection under the CAT, either in the form of withholding of removal or deferral of removal. *Id.* § 1208.16(c)(4). The petitioner will be granted withholding of removal, unless one of the exceptions requiring a mandatory denial of withholding of removal is triggered.[4] *Id.* In that event, the petitioner's removal shall be deferred, rather than withheld. *Id.*

DHS or the alien may appeal the IJ's determination to the BIA. Either party may appeal a final determination of the BIA to a federal court of appeals. 8 U.S.C. § 1252(a)(4); *see also* 8 C.F.R. § 1208.18(d) (stating that judicial review of claims for protection from removal under the CAT shall only be made "as part of the review of a final order of removal pursuant to section 242 of the [FARR] Act").

### III.   Discussion

The BIA applied the wrong standard of review to the IJ's factual findings. In doing so, the BIA failed to follow its own regulations as well as the case law interpreting those regulations.

---

[4]As discussed *supra* note 2, Turkson is ineligible for withholding of removal as a consequence of his marijuana conviction.

Because Turkson was subject to a removal order by reason of having committed an aggravated felony, our jurisdiction to review the BIA's order is limited. *See* 8 U.S.C. §§ 1251(a)(2)(C), 1227(a)(2)(A)(iii). We review the petition only to the extent that it raises questions of law or constitutional claims. *See* 8 U.S.C. § 1252(a)(2)(C)-(D).

We review the BIA's legal determinations de novo. *Hui Zheng v. Holder*, 562 F.3d 647, 651 (4th Cir. 2009). That review, however, is subject to agency deference pursuant to *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). The BIA's interpretation of its own governing regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations omitted).

The BIA is the highest administrative tribunal on immigration and nationality matters. Before 2002, the BIA reviewed all aspects of an IJ's decision de novo. In 2002, however, the applicable regulations were amended, which changed the scope of review as to the factual findings of an IJ. 8 C.F.R. §§ 1003.1(d)(i)-(ii), 1003.3(f).

8 C.F.R. § 1003.1(d)(i) now states: "The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." As to other matters, 8 C.F.R. § 1003.1(d)(ii) provides: "The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo."

Thus, the regulations establish two different levels of review. To reverse an IJ's factual finding, the BIA must determine that such a finding is clearly erroneous. In contrast, however, the BIA may substitute its opinion for that of the IJ on issues of "law, discretion, and judgment." This rule stems

from a sensible understanding of the roles and abilities of the two bodies. IJs hear witnesses and determine the credibility of evidence. The BIA reviews a paper record, devoid of the nuances of weighing evidence first hand. The IJ is thus in a better position to make factual determinations than the BIA acting in an appellate capacity. While largely deferring to those factual determinations, however, the BIA can exercise its independent judgment to evaluate not only the legal significance of the facts but also the ultimate conclusions to which those facts lead.

The explanatory comments accompanying the 2002 regulation amendments underscore this interpretation of the scope of review. "The clearly erroneous standard reflects the major role of immigration judges under the Act and implementing regulations as determiners of fact." 67 Fed. Reg. 54878, 54889. The explanatory comments further note that the "clearly erroneous" standard is not unique to reviewing decisions of immigration judges, but rather, constitutes the scope of review generally applicable to "factfinding by trial courts." *Id.*

The explanatory comments also provide some guidance as to whether the likelihood of a future occurrence constitutes a factual or a legal determination. In the analogous setting of cancellation of removal,[5] the comments support the view that findings as to the likelihood of a future occurrence constitute factual findings: "[T]hose facts that a respondent claims make up 'exceptional and extremely unusual hardship' . . . will be reviewed by the Board only to determine if the immigration judge's determination was clearly erroneous." *Id.* 54890. The "exceptional and extremely unusual hardship" inquiry necessarily turns on predicted outcomes and hardships.

---

[5]Cancellation of removal is an immigration remedy under which an alien can apply for permanent residence in the United States under certain circumstances. *See* 8 U.S.C. § 1229B.

In Turkson's case, the IJ made both factual determinations and legal judgments. Factually, he found that Turkson had previously suffered brutal violence in Ghana on account of his political beliefs; that political violence still occurs with government sanction; that Ghana's police use excessive, and sometimes fatal, force; and that if Turkson returned to Ghana, he would likely be subject to violence, detention by the police, and police brutality. As to a legal judgment, the IJ applied the CAT's definition of torture to the facts, and found and concluded that Turkson's prior experiences and anticipated treatment met the CAT definition of torture.

Upon review, the BIA failed to follow the scope of review as established by 8 C.F.R. § 1003.1(d)(1) and subjected the IJ's entire decision to de novo review. The BIA redetermined the facts found by the IJ by applying its own de novo analysis of the facts in the record and according no deference to the IJ's findings. The BIA did so by rejecting the testimony of Turkson and his witness, finding certain written evidence more credible, and rejecting the IJ's conclusions that political violence and police brutality existed in Ghana and that Turkson would likely face such brutality if returned to Ghana. In doing so, the BIA committed error as a matter of law because it failed to apply the appropriate standard of review.

The Third Circuit addressed precisely this issue in *Kaplun v. Attorney General*, 602 F. 3d 260 (3d Cir. 2010). Like this case, *Kaplun* involved a determination whether an alien would face torture upon return to his native country. The IJ had determined that the alien would be tortured, but the BIA overturned the IJ's decision, applying de novo review to that finding. The Third Circuit parsed the question of the likelihood of future torture into two distinct determinations: what would likely happen if the alien was removed, and whether the likely occurrence would amount to "torture" as defined in the CAT. The court held that the former determination is factual and BIA review of that determination is subject to the clearly     erroneous     standard     set     forth     in     8     C.F.R.

§ 1003.1(d)(ii). The latter determination is a legal judgment, applying the law to decided facts, to which the BIA applies a de novo standard of review.

Although we have not addressed the precise issue presented here and in *Kaplun*, we have applied *Kaplun* in a slightly different immigration context. In *Crespin-Valladares v. Holder*, 632 F.3d 117 (4th Cir. 2011), this Court remanded the case to the BIA because the BIA applied the wrong standard of review to the IJ's factual findings. In *Crespin-Valladares*, the petitioner applied for asylum, fearing persecution because of his familial relationships if he were removed to El Salvador. The IJ found, among other things, that the government in El Salvador had failed to control gang violence and that a main reason the petitioner was targeted for persecution by gang members was because of his uncle's cooperation with the government. *Id.* at 121. The BIA reversed the decision. In doing so, the BIA gave no deference to the IJ's finding that gang members targeted the petitioner because of his affiliation with his uncle, finding instead that the petitioner himself was targeted to intimidate him from testifying against gang members. *Id.* at 127.

This Court found the BIA's review of the IJ's decision improper: "The BIA disagreed with the IJ not because it rejected the IJ's legal interpretation of undisputed facts; rather, the BIA took the contrary view of the gang members' motivations—*a classic factual question*." *Id.* (emphasis added). We held that the BIA could not simply substitute its own factual findings for those of the IJ.

In *Crespin-Valladares*, as in this case, the BIA granted dispositive weight to a State Department report—in that case, saying that the government in El Salvador had focused on suppressing gang violence—and failed to examine other evidence to determine whether the IJ's finding was clearly erroneous. Relying on *Kaplun*, we rejected the BIA's approach. "Whether a government is unable or unwilling to control pri-

vate actors . . . is a *factual* question that must be resolved based on the record in each case." *Id.* at 128 (citation and internal quotation marks omitted; emphasis added). Parenthetically, the Court noted: "[A] finding of fact by an IJ includes expressions of likelihood based on testimony . . . and/ or documentary evidence." *Id.* at 129 (quoting *Kaplun*, 602 F.3d at 260).

As in *Crespin-Valladares*, the BIA should have applied the clearly erroneous standard to the factual determinations of the IJ in this case: what happened to Turkson before he emigrated from Ghana, what the current political climate and practices are in Ghana, and what will likely happen to Turkson if he returns to Ghana. In contrast, whether Turkson's likely future mistreatment amounts to "torture" under CAT is a legal question which the BIA is properly entitled to review de novo.

To justify the BIA'S de novo review of the IJ's entire decision, the government tries to recast a finding of likely future mistreatment as something other than a factual finding. The government argues that, because the predicted events obviously have not occurred, a conclusion about them is not a factual finding. This simplistic view of what constitutes a "fact" ignores not only the applicable regulations but also this Court's jurisprudence.

In two immigration cases, we have held that an IJ's predictions of future conditions are factual findings entitled to deference under the clearly erroneous standard. *See Saintha v. Mukasey*, 516 F.3d 243 (4th Cir. 2008); *Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007). Those cases specifically addressed the likelihood of future events occurring (respectively, whether the Haitian government would acquiesce in torture and the percentage chance of suffering female genital mutilation upon removal). We held that those determinations were factual findings. As we have noted, even Black's Law Dictionary recognizes that while facts include historical facts, they are not limited to them. *See Crespin-Valladares*, 632

F.3d at 128 ("'[Facts] include not just tangible things, actual occurrences, and relationships, but also states of mind such as intentions and opinion.'" (quoting Black's Law Dictionary 669 (9th ed. 2009)). In short, we have held that the likelihood of future mistreatment is a factual determination. Under the amended regulations and our case law, such factual determinations are only reviewable by the BIA under the clearly erroneous standard.[6]

Here, the IJ determined the present factual likelihood of a future event occurring. As the *Kaplun* court held, that the future event might not occur does not make the prediction any less a factual finding. *Kaplun*, 602 F.3d at 269. The government's reliance on this Court's decisions in *Massis v. Mukasey*, 549 F.3d 631 (4th Cir. 2008), and *Lin v. Mukasey*, 517 F.3d 685 (4th Cir. 2008), to support its argument that the BIA was correct in applying the de novo standard is unavailing. *Massis* simply acknowledges that the BIA may review de novo the IJ's "application of the law to th[e] facts." 548 F.3d at 635 n.6. Here, however, the parties do not dispute that once the BIA accepts all of the IJ's non-clearly erroneous factual findings regarding the treatment that Turkson is likely to receive if removed to Ghana, the BIA is free to review de novo whether that treatment meets the legal definition of torture. *Massis*, therefore, does not further the government's cause in any meaningful way.

---

[6]Our jurisprudence routinely treats future predictions as factual findings even outside of the immigration context. For instance, as noted in *Kaplun*, expert witnesses in medical malpractice cases frequently testify about future disability and pain and suffering. "When the jury chooses to believe the expert's predictions, it makes *a factual finding* that the plaintiff will be unable to perform certain tasks in the future and will experience some degree of pain and suffering." *Kaplun*, 602 F.3d at 270 (emphasis added). The *Kaplun* court termed such findings "inferential facts," because they are based on prior experience. The *Kaplun* court's view as to likely future mistreatment is entirely consistent with the explanatory comments—facts regarding undue hardship in the context of removal are necessarily "inferential facts" as they involve predictions of the future consequences stemming from the removal.

The government cites *Lin* for the proposition that the regulations do not prohibit the BIA from making factual determinations from an existing record during de novo review. *See Lin*, 517 F.3d at 693. This Court's holding in *Lin*, however, dealt with the BIA's alleged "impermissible fact-finding in violation of 8 C.F.R. § 1003.1(d)(3)" rather than the standard of review the BIA should apply pursuant to §§ 1003.1(d)(3)(i), (ii). At issue here is not whether the BIA may find additional facts, but rather whether the BIA may summarily reject the IJ's factual findings without first determining that the IJ clearly erred.

Neither *Massis* nor *Lin* governs this case. More importantly, the BIA's regulations and the explanatory notes accompanying them clearly delineate the bifurcated standard of review that applies to this case, and support our conclusion that predictions regarding a petitioner's likely future mistreatment are factual in nature.

We hold that a decision regarding a petitioner's likely future mistreatment is a factual determination, subject to BIA review under the clearly erroneous standard. The BIA's decision to subject the IJ's factual findings to de novo review is contrary to the plain language of the governing regulation and is therefore not controlling. *See Auer*, 519 U.S. at 461.

## IV. Conclusion

Applying *Kaplun* and the applicable regulations here, the BIA should have addressed two sets of questions with different standards. First, the BIA should have examined the record to determine if the IJ's factual findings were clearly erroneous. The factual findings subject to this deferential level of review include the IJ's pronouncements about what happened to Turkson in Ghana in 1995, what conditions currently exist in the country, and how Turkson will likely be treated upon his return. Second, under a de novo standard of review, the BIA should have applied the CAT definition to the IJ's factual

findings to determine whether the predicted conduct amounts to "torture."[7]

For the reasons stated above, the Court grants the petition for review, vacates the decision of the BIA and remands the matter to the BIA for further consideration in accordance with this opinion.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*

---

[7]To be clear, we do not mean to dictate any particular outcome on remand. Rather, we simply instruct the BIA to review the IJ's order under the proper standard as articulated in this opinion.